IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 17, 2025 Session

**IN RE DAKARI M.**

**Appeal from the Juvenile Court for Davidson County**
**No. PT263684      Sheila Calloway, Judge**

_____

**No. M2024-01673-COA-R3-PT**
_____

This is the second appeal by a mother and a father of the termination of their parental rights. We have concluded that the juvenile court correctly determined that a ground for termination existed as to the father. Regarding Mother, we find that the court erred in its analysis finding a ground for termination. We also conclude that the court failed to make sufficient findings regarding the ground for termination and vacate this portion of the order and remand for further proceedings. We also conclude that the juvenile court did not make sufficient findings of fact in its best interests analysis regarding Father. Therefore, we also vacate this part of the order and remand the matter for the juvenile court to enter an order that makes sufficient findings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part, Vacated in Part, and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which W. NEAL MCBRAYER and JEFFREY USMAN, JJ., joined.

Nicholas Perenich, Jr., Nashville, Tennessee, for the appellant, Sabrina C.

C. Michael Cardwell, Nashville, Tennessee, for the appellant, Dustan M., Sr.

Jonathan Skrmetti, Attorney General and Reporter, and Katherine P. Adams, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

This is the second appeal in the matter of the termination of parental rights of Sabrina C. ("Mother") and Dustan M. ("Father") to Dakari[1] M. (born in 2014) ("the child"). In December 2016, the Tennessee Department of Children's Services ("DCS" or "the Department") filed a petition in the Juvenile Court for Davidson County for custody and the emergency removal of the child, who was then living with his parents and another individual, Tarasha L., with whom the parents were in a relationship. Also in the home was another child of Mother's from a previous relationship ("Sister") and a younger half-sister through Father and Tarasha L.

In the petition, DCS alleged that the child was dependent and neglected due to severe physical abuse inflicted upon Sister. A doctor who treated Sister when she was admitted to the hospital for her injuries testified that she had suffered non-accidental trauma that resulted in injuries to her ankles, wrists, feet, and thighs. The injuries included ligature marks on her wrists and ankles and bruising on her thigh that appeared to be caused by being "struck with something in a looped fashion." Sister had a burn injury on the back of her right hand and bruising on her chest. Additionally, after Sister's aunt reported that she was limping, further inspection revealed that Sister had bruising and cuts on her right foot. The doctor diagnosed Sister as a victim of child abuse. In May 2019, the juvenile court entered an order adjudicating the child to be dependent and neglected based on the severe child abuse of Sister. However, the court could not "exclude [Mother] or [Father] as perpetrators" of the injuries.[2]

Two years later, in May 2021, DCS filed a petition to terminate Mother's and Father's parental rights to Dakari. As to both parents, the petition alleged abandonment by failure to establish a suitable home, persistence of conditions, severe child abuse, and failure to manifest an ability and willingness to assume legal and physical custody of the child. As to Father, the petition also alleged abandonment by failure to support.

A hearing on the petition was held over three days in December 2021. Testimony was given by Mother, Father, the child, the child's foster father, a DCS worker, and an in-home care coordinator. At the time of the hearing, Father no longer lived with Mother or Tarasha L. and was primarily living in motels on a week-to-week basis. Father was

---

[1] Dakari's name is spelled various ways in the record, and his birth certificate uses a different spelling. However, when asked to spell his name at the termination hearing, the child spelled it "Dakari." Therefore, this opinion will use the child's preferred spelling.

[2] In a subsequent order, the juvenile court also found Sister to be dependent and neglected and a severely abused child pursuant to Tenn. Code Ann. § 37-1-102(b)(27)(A) and (B).

unemployed. While he had been employed when the child was first placed in foster care, Father testified that his numerous illnesses prevented him from continuing this job. At the time of the hearing, Father had applied for Supplemental Security Income but had been denied and was in the process of appealing. Father acknowledged that he had not paid any child support since Dakari had entered DCS's custody.

Father testified that he suffered from congestive heart failure, hypertension, diabetes, anxiety, and depression. He had also been diagnosed with bipolar disorder; however, he did not feel his symptoms constituted a "disorder" and did not take his prescribed medication regularly. Father stated that he had had various therapists, but that he had not been to therapy in some time because he felt it was not something he needed and that he believed his depression would be cured if he were to regain custody of Dakari. Regarding Father's substance abuse and criminal histories, we previously summarized the evidence as follows:

> Father also had a history of drug abuse, including cocaine and THC. He completed treatment for drugs and alcohol in August 2020. He testified that he had been clean for over four years at the time of trial. While he tested positive for marijuana in 2017, 2019, and 2020, he viewed his marijuana use as "medical." The family service worker agreed that he had not tested positive for drugs since she had been assigned to the case in 2021.

> Father acknowledged a criminal history. But he saw being incarcerated "once or twice in [the past] five years" as an improvement because he "used to go to jail all the time for . . . small things." Yet he still faced a pending criminal charge for domestic violence against Tarasha L. In response to questions about those charges, Father declined to answer, invoking his Fifth Amendment privilege against self-incrimination.

*In re Dakari M.*, No. M2022-00365-COA-R3-PT, 2024 WL 1269860, at *2 (Tenn. Ct. App. Mar. 26, 2024) ("*Dakari I*").

At the time of trial, Mother had been living in transitional housing at the Salvation Army for approximately one year, and she believed that Dakari could live with her there. Mother worked as a prep cook and earned approximately $800 per week. Regarding Mother's health, she testified that she suffered from depression, post-traumatic stress disorder, and obsessive-compulsive disorder, but she did not take medication to treat these conditions. Mother testified that she was seeing a therapist. She also reported going to domestic violence counseling periodically for the past three years. Mother admitted to using marijuana and cocaine, and she previously tested positive for these substances at the time Dakari first entered foster care. However, Mother had not tested positive for cocaine again. Further, she had completed treatment for substance abuse, and the family service worker confirmed that Mother had not tested positive for drugs recently.

Mother and Father each testified about the status of their relationship; however, their testimony failed to align in important ways. Those discrepancies are as follows:

Mother and Father gave conflicting testimony about the status of their relationship. Father testified that he currently lived with Mother. He hoped to marry her as soon as the next month. And he referred to her as "my wife." But Mother claimed she did not plan to continue any relationship with him other than a co-parenting one. She acknowledged physically violent altercations with Father in the past. But she had learned about "Stockholm Syndrome" through domestic violence classes, and she believed she had overcome it because she had not gone back to Father after leaving the shelter.

Still, the family service worker opined that Mother and Father "interact as a unit." Although Mother no longer lived with Father, she paid for his motels. He relied on Mother for medication. She gave him car rides. And she paid for things for him. Father described her as "basically my caregiver." The family service worker believed that Mother would allow the Child to see Father even if Father's parental rights were terminated "just because of the way that they interact so much like a family unit."

The case manager from Camelot testified that he saw Father have "negative interactions" and "get hostile" with Mother during visitation with the Child. And the parents sometimes smelled of marijuana. The case manager feared Mother would not be able to keep the Child safe because she was still connected with Father.

*Id.* at *3.

On February 24, 2022, the juvenile court entered an order terminating Mother's and Father's parental rights to the child. The juvenile court found that DCS had proven all of the alleged grounds and that termination was in the child's best interests. Mother and Father each appealed. After DCS filed a motion requesting that this Court remand the matter to the juvenile court, this Court remanded the matter to the juvenile court to enter an order that made sufficient findings of fact. On December 22, 2022, the juvenile court entered an amended order.

On appeal, DCS only defended the grounds of severe abuse as to Mother and the ground of failure to manifest as to both parents. The Department conceded that the remaining grounds had not been proven by clear and convincing evidence. Regarding the ground of severe abuse, this Court determined that the juvenile court erred in finding it had been proven by clear and convincing evidence and reversed. *See id.* at *4. We also determined that clear and convincing evidence supported the finding that both parents had failed to manifest an ability or willingness to assume physical custody or financial

- 4 -

responsibility for the child. *Id.* at *5. However, we determined that the juvenile court had failed to make sufficient findings regarding the risk that returning the child to his parents' care would pose. *Id.* Therefore, we vacated the juvenile court's order and remanded the matter for the court to make sufficient findings of fact on the second prong of the failure to manifest ground. *Id.* We also noted that the juvenile court's best interest analysis was "sparse" and had "only applied seven of the statutory best interest factors," including a factor "under a former version of the best interest factors." *Id.* at *6. Therefore, we directed the juvenile court to "reconsider its best interest analysis in light of the applicable best interest factors and enter an order 'that makes specific findings of fact and conclusions of law.'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(k)).

The juvenile court entered a second amended order (the third final order in this matter) on October 7, 2024. Mother and Father appealed again and each present two issues for our review, which we have consolidated and restated for clarity: (1) whether the trial court erred in finding clear and convincing evidence of a ground for termination; and (2) whether clear and convincing evidence proved termination was in the child's best interest.

STANDARD OF REVIEW

"[B]oth the United States and Tennessee Constitutions protect parents' rights to the custody and care of their children." *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). This interest is "'far more precious than any property right.'" *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982)). However, parents may forfeit these rights by conducting themselves in a manner that substantially harms their children. *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010). An order terminating a parent's rights to his or her child must be based on clear and convincing evidence that grounds for termination exist and that termination of the parent's rights is in the child's best interests. Tenn. Code Ann. § 36-1-113(c)(1)-(2); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013). The petitioner bears the burden of producing clear and convincing evidence of both of these requirements. *In re Angela E.*, 303 S.W.3d at 250.

Findings of fact are reviewed de novo upon the record with a presumption of correctness unless the preponderance of the evidence indicates otherwise. TENN. R. APP. P. 13(d); *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "[T]he reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524. "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

ANALYSIS

For reasons that will become apparent later in this opinion, we believe it is necessary to begin our analysis with a discussion of the standards for orders terminating a parent's rights to his or her child. As a different panel of this Court recently explained in an opinion vacating a termination order from the same juvenile court for failure to consider all relevant best interest factors:

"Meticulous compliance with the mandates of Tenn. Code Ann. § 36-1-113(k) [is] required by appellate courts." *In re MEI*, No. E2004-02096-COA-R3-PT, 2005 WL 2346978, at *3 (Tenn. Ct. App. Sept. 26, 2005). "When a trial court has not complied with Tenn. Code Ann. § 36-1-113(k), we cannot simply review the record de novo and determine for ourselves where the preponderance of the evidence lies as we would in other civil, non-jury cases." *In re K.N.R.*, [No. M2003-01301-COA-R3-PT,] 2003 WL 22999427, at *3 [(Tenn. Ct. App. Dec. 23, 2003)].

A trial court's failure to comply with Tenn. Code Ann. § 36-1-113(k) affects more than the standard of appellate review. It affects the viability of the appeal. When a trial court fails to enter an order containing adequate findings of fact and conclusions of law with regard to all alleged grounds for termination, the Tennessee Supreme Court has instructed the appellate courts to remand the case to the trial court for the preparation of appropriate written findings of fact and conclusions of law. *In re D.L.B.*, [118 S.W.3d 360, 367 (Tenn. 2003)].

*In re C.R.B.*, No. M2003-00345-COA-R3-JV, 2003 WL 22680911, at *4 (Tenn. Ct. App. Nov. 13, 2003) (footnote omitted).

*In re Cartier H.*, No. M2022-01576-COA-R3-PT, 2023 WL 7158076, at *14 (Tenn. Ct. App. Oct. 31, 2023) (quoting *In re Maria B.S.*, No. E2011-01784-COA-R3-PT, 2012 WL 1431244, at *3 (Tenn. Ct. App. Apr. 25, 2012)). With these principles in mind, we turn next to the merits of this appeal.

I.      Ability and Willingness

The sole remaining ground upon which Mother's and Father's rights may be terminated is found in Tenn. Code Ann. § 36-1-113(g)(14). This ground, commonly referred to as "ability and willingness," allows a court to terminate a parent's rights when:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14).

This ground contains two essential prongs that must be proven by clear and convincing evidence. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). The first prong requires proof that the parent has failed to manifest an ability or willingness to assume custody of the child or financial responsibility for the child. *Id.* In our opinion in *Dakari I*, we determined that the juvenile court had correctly concluded that neither parent had manifested an ability or willingness and thus concluded that the first prong was satisfied. *In re Dakari M.*, 2024 WL 1269860, at *5.

However, we also determined that the juvenile court had failed to make sufficient findings regarding the second prong, the substantial harm that returning the child to his parents would pose. *See id.* Although the juvenile court in this case found that "placing the child in [Mother's and Father's] legal and physical custody would certainly pose a risk of substantial harm" to the child, it "did not identify the substantial risk that would come from placement with either Mother or Father." *Id.* On remand, we directed the juvenile court to enter an order making sufficient findings regarding this prong. Therefore, in this second appeal, our task is to determine whether DCS has proven by clear and convincing evidence that placing Dakari with Mother and Father would pose a risk of substantial harm to him. Regarding what constitutes "substantial harm," we have made the following observations:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted).

The juvenile court made the following findings regarding the risk of substantial harm in returning the child to his parents:

> At the time of the hearing, Father was primarily living in motels week-to-week. Father's housing instability was largely due to his lack of

employment. Despite his unsuccessful efforts to apply for Supplemental Security Income, he was still in the appeal process of the denial. In the meantime, he was not consistently meeting with his therapist. Father still had pending charges and declined to answer any questions as to the charges, invoking his Fifth Amendment privilege against self-incrimination.

As to Mother, she had been living at the Salvation Army for approximately one year at the time of the trial. Mother admitted that she did not have stable housing throughout the entire case. Mother also admitted to suffering from several disorders, but not taking any medication.

Although during the pendency of the trial the parents did have visitation with the child, the case manager from Camelot testified that visits would sometime[s] become very intense with Father having "negative interactions" and would sometimes "get hostile" with Mother during the visits with the child. The case manager also believed that the parents smelled of marijuana during some of the visits.

Since the first order in this case, the parents have not had visits with the child. The child has had no contact with the parents in over three (3) years. At this point, the parents are like strangers to the child and reintroduction to them would pose a substantial risk of psychological welfare of the child.

Beginning with Father, we agree with the juvenile court that returning Dakari to his care would create a risk of substantial harm. Father lacks stable housing and resides in various hotels, often relocating every couple of weeks. At the trial on the termination petition, Father testified that he had moved into his current living arrangement the previous day. Before that, Father had lived in a Days Inn for one week, a Maxwell House hotel for one week, with his mother for two or three weeks, and with Tarasha L. before that. We have previously relied upon a parent's lack of stable housing as evidence of a risk of substantial harm. *See In re Jaylynn J.*, No. M2023-01496-COA-R3-PT, 2024 WL 2933349, at \*13 (Tenn. Ct. App. June 11, 2024) (citing *In re Damium F.*, No. M2021-01301-COA-R3-PT, 2022 WL 3100560, at \*10 (Tenn. Ct. App. Aug. 4, 2022)).

Father admitted to having bipolar tendencies, though he claimed that his condition did not rise to the level of a disorder. Regardless of Father's classification of his mental condition, he was prescribed medication, which he regularly failed to take without medical guidance to do so. Father's stated reasons for failing to take his medication appeared to be a combination of believing it to be unnecessary and forgetting to take it. Indeed, Father testified that Mother previously set out his medication so that he would take it. Father also has a history of domestic violence against his various partners, including Mother, and was reported to "get hostile" with Mother during visits. These aspects of Father's life contribute

to a risk of substantial harm to Dakari were he to return to Father. *See In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021) ("And parents with a significant, recent history of substance abuse, mental illness, and/or domestic violence could lead to a conclusion of a risk of substantial harm."). Therefore, we affirm the juvenile court's finding as to Father.

Turning next to Mother, we conclude that the juvenile court erred in finding a risk of substantial harm should Dakari be returned to her care based upon her housing and the passage of time without visitation. The juvenile court first determined that Mother lacked appropriate housing. We respectfully disagree that this provided a basis for finding a risk of substantial harm. Mother testified that the Salvation Army provided stable housing for "single parents, singles, and males."[3] Mother paid rent for this room and testified that children resided there with their parents. There is no evidence in the record of Mother's living arrangement being dangerous or unsuitable for children. Notably, DCS never visited Mother's room, which prevented any testimony other than Mother's regarding the suitability of her housing. Without more, we cannot identify anything beyond a theoretical possibility of harm. *See Ray*, 83 S.W.3d at 732. That Mother resided in transitional housing, standing alone, is insufficient to find a risk of substantial harm.

Our opinion in *In re Edward C.*, 684 S.W.3d 410 (Tenn. Ct. App. 2023), provides an example of where this Court determined that a parent living in transitional housing supported a finding of substantial harm. In that case, the parent's living arrangement was one consideration amongst numerous other issues that contributed to this finding, including the inability to maintain stable housing and employment and the child having specific therapeutic needs for which the mother could not provide adequate care. *In re Edward C.*, 684 S.W.3d at 434. The present matter is readily distinguishable from that case. Here, Mother had lived in the Salvation Army for a year prior to trial, and nothing in the record indicated that she was at risk of being made to leave. She was also working towards having independent housing. Mother also maintained stable employment. Mother's housing arrangement, by itself, is insufficient to support a finding of a risk of substantial harm.

Finally, the juvenile court found that returning Dakari to Mother's care would pose a risk of substantial harm due to the amount of time that had passed since Mother had last visited the child. However, this time is in large part due to the juvenile court's failure to enter a sufficient order for this Court to review. To summarize the procedural history of this case, the first termination order was entered in February 2022, and Mother's visitation was suspended upon the entry of this order. However, this order was deficient, and the first

---

[3] The Department points to testimony from Mother, where she states, "I had the Salvation Army, which is housing for – it's no housing [sic] for people who have children. Like if I was given the opportunity, Dakari could have came to the shelter with me then, and probably if I were to change the outcome of my housing situation," for the assertion that Mother admitted the Salvation Army was inappropriate for the child. Mother also testified that there are children who live there with their parents at the Salvation Army, and she appeared to testify that Dakari could live with her there.

remand of this matter to the juvenile court was necessary. Accordingly, this Court entered an order later that year, remanding the matter "for the sole purpose of entering a new order, *based on the evidence already presented*," that made sufficient findings of fact. The juvenile court subsequently entered an amended order in December 2022. This second order also made insufficient findings, and we remanded the matter to the juvenile court again. The second amended order in this matter was then entered in October 2024. Therefore, just over two and a half years passed with Mother not visiting the child. This is, at least in part, due to the repeated remands necessitated by deficient orders.

We do not believe it would be appropriate to terminate Mother's rights based upon the time that had passed during the pendency of this matter. Importantly, in our opinion in *Dakari I*, we did not direct the juvenile court to consider post-judgment developments in the case as we have in other cases. *See, e.g.*, *In re Disnie P.*, No. E2022-00662-COA-R3-PT, 2023 WL 2396557, at *14 (Tenn. Ct. App. Mar. 8, 2023) (stating that "time ha[d] marched on" during the pendency of the litigation and granting the trial court discretion to consider additional evidence on remand). Instead, our direction was to enter an order that made sufficient findings of fact regarding the second prong of the failure to manifest ground. After a case has been appealed, when the trial court receives a mandate from an appellate court and reacquires jurisdiction over the case, "the case stands in the same posture it did before the appeal except insofar as the trial court's judgment has been changed or modified by the appellate court." *Earls v. Earls*, No. M1999-00035-COA-R3-CV, 2001 WL 504905, at *3 (Tenn. Ct. App. May 14, 2001) (citing *Raht v. S. Ry. Co.*, 387 S.W.2d 781, 786 (Tenn. 1965)). "Thus, the trial court does not have the authority . . . to expand the proceedings beyond the remand order." *Id.* (citing *Cook v. McCullough*, 735 S.W.2d 464, 469 (Tenn. Ct. App. 1987)). A contrary decision would create a perverse incentive, whereby delays in proceedings after a remand could be used against parents. *Cf. In re Adoption of A.M.H.*, 215 S.W.3d at 812 (adopting similar reasoning in the context of child custody, reasoning that "the only evidence of substantial harm arises from the delay caused by the protracted litigation and the failure of the court system to protect the parent-child relationship throughout the proceedings").

Without considering the time Mother had not visited the child, we cannot find a risk of substantial harm in the juvenile court's order. While we have previously found that returning a child to a near-stranger may make substantial harm sufficiently probable, *see In re Brianna B.*, 2021 WL 306467, at *6, we have also held that "[r]emoval of a child from foster parents that the child has been living with for a long time and may have bonded with does not constitute substantial harm." *In re Nakayia S.*, No. M2019-00644-COA-R3-PT, 2020 WL 4558376, at *8 n.6 (Tenn. Ct. App. Aug. 7, 2020) (citing *In re Alysia S.*, 460 S.W.3d 536, 576-77 (Tenn. Ct. App. 2014)). Therefore, even though at the time of the hearing Dakari had been living with his foster parents for some time, his removal from their care alone would not constitute substantial harm.

Although we conclude that the juvenile court's order erred in the aforementioned ways, we also conclude that the court failed to make sufficient findings regarding the status of Mother's and Father's relationship. At the trial, Mother and Father gave highly conflicting testimony regarding the status of their relationship, and it was unclear to what extent Mother continued to interact with Father. Aside from general findings regarding Mother and Father, the juvenile court's order fails to make specific findings regarding the true nature of the parents' relationship. This is an important consideration in light of our determination that returning Dakari to Father's care would pose a risk of substantial harm.

Therefore, we vacate the juvenile court's finding that returning Dakari to Mother's care would pose him a risk of substantial harm and remand the matter for the entry of an order that makes sufficient findings regarding Mother's and Father's relationship. *See In re Dakari M.*, 2024 WL 1269860, at *5 (vacating and remanding the juvenile court's order for failure to make specific findings of fact regarding this ground). We recognize that time has continued to pass during the pendency of litigation. Therefore, on remand, the juvenile court may exercise its discretion to consider additional evidence of the current status of the parents' relationship with one another. *See In re Disnie P.*, 2023 WL 2396557, at *14.

We acknowledge that Dakari has been in foster care for a prolonged period of time, and that our decision to vacate the termination of Mother's rights will necessarily prolong this time. It is unfortunate that, "[i]n parental termination proceedings, the burdens of extended litigation fall most heavily upon children—those most vulnerable and most in need of protection, stability, and expeditious finality." *In re Carrington H.*, 483 S.W.3d at 533. "These cases involve not simply 'rights,' but the life and well-being of an innocent child." *In re Markus E.*, 671 S.W.3d 437, 475 (Tenn. 2023). However, "'[t]he issue before us is confined to whether, under the circumstances of this case,' the evidence supports a decision 'to completely terminate the parent-child relationship.'" *Id.* at 474 (quoting *In re J.R.P.*, No. M2012-02403-COA-R3-JV, 2013 WL 4477860, at *10 (Tenn. Ct. App. Aug. 19, 2013).

II.     Best interests

Our decision to vacate the termination ground as to Mother necessarily pretermits discussing whether termination of her rights was in Dakari's best interests. However, as we have found a ground for termination as to Father, we next consider whether the juvenile court properly determined that termination of his parental rights is in Dakari's best interests. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254.

Not all parental misconduct is irredeemable, and our state's "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best

- 11 -

interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). Courts are to focus on the best interests of the child, *id.*, and, at this stage, the child's interests diverge from those of his or her parents. *In re Audrey S.*, 182 S.W.3d at 877. Courts conduct this analysis from the perspective of the child. *Id.* at 878. The facts considered in a court's best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

In undertaking the best interest analysis, courts must consider the factors enumerated in Tenn. Code Ann. § 36-1-113(i). "[T]he facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case." *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017). "[T]he best interests analysis is and must remain a factually intensive undertaking." *Id.* Any single factor may dictate the outcome of the analysis, *In re Audrey S.*, 182 S.W.3d at 878, but courts must always consider all of the factors and all relevant proof. *In re Gabriella D.*, 531 S.W.3d at 682.

In our previous opinion, despite the issue of whether termination was in Dakari's best interests being pretermitted, we noted that the juvenile court's factual findings were insufficient. *In re Dakari M.*, 2024 WL 1269860, at *6. We then directed the juvenile court to reconsider its analysis on remand. *Id.* The juvenile court reconsidered its analysis in the second amended order. However, its analysis is still insufficient. The juvenile court only considered eleven of the twenty factors.[4] While the juvenile court was not required to find the existence of every factor, *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005), it was required to consider all relevant factors. *In re Gabriella D.*, 531 S.W.3d at 682. Indeed, even in an outlier case where the consideration of a single factor dictates the outcome, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* From its analysis, we cannot conclude that the juvenile court considered all of the relevant factors.[5]

The Department asserts on appeal that, although the juvenile court did not make specific findings about an additional seven factors, the court's findings in other parts of the order support the application of these findings. The Department bases its contention on the case *In re Glenn B.*, No. M2023-00096-COA-R3-PT, 2023 WL 8369209 (Tenn. Ct. App. Dec. 4, 2023). Respectfully, we disagree with the characterization of this opinion. *In re*

---

[4] The juvenile court did not label each factor it considered. The court's analysis appears to overlap such that it is arguable that the court considered even fewer factors.

[5] Though the juvenile court did make some findings related to some of the factors, we note that the court did not make any findings regarding the remaining factors such as that they were neutral or inapplicable. It simply did not address them at all.

*Glenn B.* stated that, while Tenn. Code Ann. § 36-1-113(k) mandates courts to make specific findings of fact in termination orders, the statute "does not indicate *where* a court should situate those factual findings within its final order." *In re Glenn. B.*, 2023 WL 8369209, at *8. We do not believe that this opinion allows for a de novo review of best interest factors not addressed by the juvenile court, and it certainly does not allow courts to skirt their responsibility to consider all relevant factors.

Additionally, the Department's assertion that evidence in the record supports seven of the factors that were left unaddressed by the juvenile court only serves to support our determination that all relevant factors were not considered. Many of the unconsidered factors appear relevant to the determination of whether termination of Father's parental rights was in Dakari's best interests.[6] For example, the Department asserts that evidence in the record supported the application of factor (I), which directs courts to consider the child's significant relationships with people other than caregivers. *See* Tenn. Code Ann. § 36-1-113(i)(1)(I). We agree that there is sufficient evidence to make the application of this factor necessary. The juvenile court also failed to consider factor (N). This factor directs courts to consider whether the parent or another person frequenting the home has shown brutality, abuse, or neglect towards the child or any other child. *See id.* § 36-1-113(i)(1)(N). This factor would appear to be especially important to consider in light of the reasons for Dakari's removal from his parents' care. Additionally, the juvenile court did not address factor (L), which directs courts to consider the efforts made by DCS in assisting the parent. *See id.* § 36-1-113(i)(1)(L). A large portion of Father's testimony at the termination hearing concerned the efforts made by DCS and his assertion that these efforts were insufficient, but the juvenile court did not address these assertions or make any findings whatsoever related to this factor.

Further, several other findings the juvenile court did make are either conclusory or insufficient. "All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order." *Id.* § 36-1-113(i)(3); *see also In re Bentley E.*, 703 S.W.3d 298, 304 (Tenn. 2024) (stating that "the trial court should make factual findings supporting the application of the factor"). However, in its analysis of factor (A), the juvenile court stated: "It is in the child's best interest for termination to be granted as to the Respondents as the child has a critical need for stability and continuity of placement through his minority." Respectfully, this is insufficient and misstates the analysis that the factor directs courts to address. Factor (A) directs courts to look at "the effect a termination of parental rights" will have on the child's need for stability. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A). Simply stating that the child had a need for stability is insufficient and further leads to the conclusion that the juvenile court did not adequately consider the best interest factors.

---

[6] That we only addressed three of the unaddressed factors should not be construed to mean that the other factors are inapplicable or of less importance. These three are illustrative of the deficiencies in the juvenile court's findings.

To be sure, several factors have sufficient analysis. However, we cannot find that the juvenile court considered all relevant factors in its analysis. "[I]t is the trial court's duty to consider whether DCS met its burden to produce evidence of each applicable factor and to make specific findings thereon." *In re Cartier H.*, 2023 WL 7158076, at *14. We have previously applied this rule to cases where the trial court has failed to make sufficient findings in support of its best interests determination. *Id.*

"As stated by our Court in *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005), '[n]o civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever.'" *In re Bentley E.*, 703 S.W.3d at 304. The seriousness of these proceedings demands courts comply with our statutes. Because the juvenile court has not made sufficient findings regarding whether it is in Dakari's best interests that Father's parental rights be terminated, the appropriate remedy is to vacate this portion of the order and order yet another remand to the juvenile court. *See id.*

We note that this is the third remand in this matter and the second where we directly state that the juvenile court's best interests analysis is insufficient. Therefore, the juvenile court is directed on remand to enter an order making explicit factual findings regarding all of the relevant best interests factors regarding Father.[7] Based upon our recognition that "time has marched on" during this litigation, on remand, the juvenile court may use its discretion to consider additional evidence properly before it. *See, e.g.*, *In re Disnie P.*, 2023 WL 2396557, at *14.

CONCLUSION

The judgment of the trial court is affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. Costs of this appeal are assessed against the appellee, the Tennessee Department of Children's Services, for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE

---

[7] Although the issue is pretermitted by our determination that the order failed to make specific findings regarding the termination ground as to Mother, we note that the juvenile court's best interest analysis is also insufficient as to Mother. Therefore, on remand, if the trial court determines that returning the child to Mother's care would pose a risk of substantial harm to him, in the interest of judicial economy, the juvenile court should reconsider its best interests analysis regarding Mother. If the juvenile court determines that this is necessary, it may, in its discretion, consider additional evidence.